IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| KENNETH D. BELL, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com,<br><br>    Plaintiff,<br><br>vs.<br><br>GRIMES & REESE P.L.L.C. and KEVIN D. GRIMES,<br><br>    Defendants. | Civil Action No. 3:14-cv-351 |

## COMPLAINT

Kenneth D. Bell (the "Receiver"), as Receiver for Rex Venture Group, LLC ("RVG") d/b/a www.ZeekRewards.com ("ZeekRewards" or "Zeek"), alleges as follows:

## SUMMARY OF CLAIMS

1. From January 2011 until August 2012, RVG operated a massive Ponzi and pyramid scheme through ZeekRewards, an internet based so-called "MLM" (multi-level marketing) program. Kevin D. Grimes served as legal counsel to RVG from around January 2012 until August 2012, when RVG was placed into receivership. This lawsuit is one of several steps the Receiver is taking pursuant to his court-ordered duties to the Receivership Estate to recover damages for the harms incurred by RVG.

2. By virtue of his knowledge of RVG and ZeekRewards and his legal expertise, Grimes knew or should have known that RVG was perpetrating an unlawful

scheme which involved a pyramid scheme, an unregistered investment contract and/or a Ponzi scheme. Despite this knowledge, Grimes actively encouraged investors to participate in the scheme by creating a so-called "compliance" program that provided a false façade of legality and legitimacy and knowingly allowed his name to be used to promote the scheme. Grimes' improper and negligent actions, which breached his fiduciary duties to RVG and assisted RVG's Insiders to breach their fiduciary duties, caused significant damage to RVG. As described in detail below, Grimes is liable to RVG both for those damages and the profits he made from RVG.

## THE PARTIES

### The Receiver

3. Kenneth D. Bell is the Receiver appointed by this Court in *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action") for and over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a ZeekRewards.com and its subsidiaries and any businesses or business names under which it does business (the "Receivership Entities"). For jurisdictional purposes, Plaintiff is a citizen of the State of North Carolina.

### The Receivership Entity

4. The primary Receivership Entity, Rex Venture Group, LLC is a Nevada limited liability company with its former principal place of business in Lexington, North Carolina. RVG wholly owns and operated ZeekRewards, an internet website (www.zeekrewards.com) with a physical location for operations in Lexington, North

2

Carolina, and internet customers and contacts in this judicial district and throughout the United States and internationally. RVG also owned and operated Zeekler.com, an online auction business.

### The Defendants

5. Defendant Grimes & Reese, P.L.L.C. ("Grimes & Reese") is a professional limited liability company organized under the laws of the State of Idaho. Grimes & Reese may be served with service of process by serving its agent authorized to receive service of process, Kevin D. Grimes, 615 Hoopes Ave., Idaho Falls, ID 83401-6106.

6. Defendant Kevin D. Grimes is an individual who currently resides in the State of Idaho.

### JURISDICTION, VENUE AND STANDING

7. On August 17, 2012, the Securities and Exchange Commission filed the SEC Action in this District pursuant to Sections 20(b), 20(d)(1) and/or 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and/or 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa] to halt the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek the appointment of a receiver for RVG.

8. On the same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court authorized and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits,

imposition of constructive trusts and any other legal and equitable relief that the Receiver deems necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate.

9. Within 10 days of his reappointment on December 4, 2012, the Receiver filed the original Complaint and Agreed Order in the SEC Action in all of the United States District Courts pursuant to 28 U.S.C. § 754 giving this Court jurisdiction over RVG's property in every federal district.

10. As an action brought by the Receiver in furtherance of his appointment and in the performance of his duties as directed by this Court, this action is within the ancillary jurisdiction of this Court.

11. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

12. This action is also within the ancillary jurisdiction of this Court because this action concerns RVG's property and assets, which are now under this Court's exclusive jurisdiction.

13. This Court has subject matter jurisdiction over this matter pursuant to its common law ancillary jurisdiction as set forth above.

14. Also, this Court has subject matter jurisdiction under 28 U.S.C. § 1367 because this action is directly related to the claims in the SEC Action, concerns property within this Court's exclusive control and/or is in furtherance of the duties given to the Receiver by this Court.

15. This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1692.

16. This Court also has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. §1-75.4 because, *inter alia*, the Defendants provided legal services to RVG, which operated in North Carolina, and they received payments from RVG through its banks located in North Carolina. By voluntarily assisting the operation of the ZeekRewards scheme, including numerous communications with RVG and/or meetings in North Carolina, the Defendants created a substantial connection to North Carolina such that the exercise of personal jurisdiction over them is fair and just.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts and transfers alleged herein, as well as the harm sustained because of Defendants' actions and omissions, occurred in this District. Defendants provided legal services to RVG in North Carolina, and these services directed at North Carolina gave rise to the causes of action asserted below.

18. The Receiver has standing to bring the claims made in this action pursuant to his authority and the direction of this Court.

19. Pursuant to the Agreed Order, the Receiver has obtained the permission of this Court to file this action.

# FACTUAL BACKGROUND

*The ZeekRewards Scheme[1]*

20. Beginning at least as far back as 1997, Paul Burks, RVG's owner and lead executive, operated a number of generally unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related entities).

21. Dawn Wright-Olivares was RVG's Chief Operating Officer and the Chief Marketing Officer of ZeekRewards. Together with Burks, Wright-Olivares developed the ZeekRewards scheme.

22. Other key employees of RVG included Daniel ("Danny") Olivares, Wright-Olivares' stepson who was responsible for designing and running RVG's websites and databases with Burks; Alexandre ("Alex") de Brantes, Wright-Olivares' then-fiancée who had the title of Executive Director of Training and Support Services; Roger Plyler, who handled "affiliate relations"; and Darryle Douglas, who was a member of RVG's senior-level management. Collectively, these individuals may be referred to as RVG's "Insiders."

23. In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items ranging from personal electronics to cash were auctioned to bidders.

---

[1] A more detailed description of the operation of the ZeekRewards scheme is contained in paragraphs 36-134 of the Complaint against RVG's Insiders filed in *See Bell v. Burks et al*, No. 3:14-cv-89 (W.D.N.C. filed Feb. 28, 2014), which is attached as Exhibit 1. The allegations of those paragraphs are hereby incorporated by reference and alleged in this complaint.

24. A "penny auction" does not work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price rises based on the amount of the bid until there is no higher bid or the amount of time set for the auction expires. In a "penny auction," bids must be *purchased* by bidders, and each incremental bid placed raises the amount of the total price of the auction item only by $0.01. The winner pays the final auction price (plus the cost of bids used), which is theoretically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

25. During 2010, the Zeekler penny auctions were not very successful, but RVG's fortunes changed in 2011. In January 2011, RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It falsely purported to pay a portion of the profits from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. Also, participants in ZeekRewards, often called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

26. The financial essence of the scheme – to buy bids to get a profit share and get paid for recruiting others to the scheme – was clear to many affiliates and was or should have been clear to Grimes. From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program. Dawn Wright-Olivares was very clear about the plan, telling Danny Olivares on January

7

21, 2011: "We're just going to use bids as currency." On another occasion, Dawn Wright-Olivares referred to the compounding bids as "Monopoly money."

27. ZeekRewards emphasized that the offer to pay Affiliates for purchasing compounding / sample / VIP "bids" distinguished those bids from the simple purchase of retail bids to participate in the Zeekler auctions. In the "About us" section of the ZeekRewards website, the company wrote: "PLEASE NOTE: To qualify for the 125% reward points you MUST buy the bids in the ZeekRewards back office. Bids purchased on the Zeekler Penny Auction site are 'retail customer' bids and do not qualify."

28. Further, ZeekRewards made clear that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket*.") (emphasis added).

29. As one Affiliate told Burks, "I know how the system works mathematically and you know I know. Whether you call the bids bids or hamburgers makes no difference. People are not joining Zeek to get hamburgers, or auction bids; they are joining Zeek to make money…."

30. Not surprisingly, relatively few ZeekRewards non-retail bids were used in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids sold to Affiliates – less than 1/3 of 1%.

8

31. The ZeekRewards scheme, rather than the penny auction site, was the source of nearly all the company's income. Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business. According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold.

32. Grimes knew or should have known that insufficient income from the penny auction business was being made to pay the daily "profit share" promised by ZeekRewards. Grimes knew or should have known that the money used to fund ZeekRewards' distributions to Affiliates came almost entirely from new participants rather than income from the Zeekler penny auctions.

33. Further, Grimes knew or should have known that the alleged "profit percentage" was nothing more than a number made up by Burks or one of the other Insiders. Rather than reflecting the typical variances that might be expected in a company's profits, the alleged profits paid in ZeekRewards were remarkably consistent, falling nearly always between 1% and 2% on Monday through Thursday and between .5% and 1% on the weekends, Friday through Sunday.

34. With RVG's and Grimes' knowledge, Affiliates regularly and openly touted the consistent payments in their recruiting of new participants. For example, one leading Affiliate's email footer said: "It has been going like clockwork for over 220 days, 7 days per week."…. "EVERYONE. . .GETS. . .PAID. . .FIRST. . .DAY!" . . . This works every time with just one minute per day! If you're not getting paid every single

9

day for 1 minute of work, . . . [sic] why not?" . . . "100 percent of our active members are paid daily 100 percent of the time within their first 24 hours without any referrals."

35. This fake consistency should have, at a minimum, caused reasonably diligent legal counsel to inquire further about the validity of the alleged profits. Indeed, the program publicly advertised historical average returns of 1.4% per day, which no legitimate investment could accomplish. But, Grimes deliberately turned a blind eye to these incredible claims and chose not to seek further information.

36. It was or should have been obvious to Grimes that ZeekRewards succeeded because it promoted this lucrative "compensation plan," offering large amounts of passive income to entice individuals to participate in the scheme. Grimes knew that participants in the ZeekRewards scheme invested money in the scheme expecting that they would receive profits from the Zeekler penny auction or other Zeek efforts. Thus, Grimes knew or should have known that RVG, with his assistance, was promoting an unlawful unregistered security.

37. Finally, Grimes knew or should have known that the ZeekRewards compensation plan was paying Affiliates to recruit other Affiliates in an unlawful pyramid-style payment system. ZeekRewards openly referred to this system as the "Matrix."

38. The Matrix pyramid was initially a "2x21" matrix in which Affiliates made multi-level marketing commissions for 21 levels down in their "organization." Later, ZeekRewards used a "2x5 forced-fill matrix," which is a pyramid with 63 positions that paid a bonus to Affiliates for every "downline" investor within each affiliate's first five

levels, plus a "matching bonus" for every subsequent 5th level where certain qualifiers were met; so in effect, the commissions could be earned indefinitely.

39. To get bonuses through the Matrix, Affiliates just had to (1) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (2) recruit at least two other "Preferred Customers" (i.e., investors who also enrolled in a monthly subscription plan). Once qualified, Affiliates earned bonuses and commissions for every paid subscription within their "downline" pyramid, whether or not they personally recruited everyone within the matrix.

40. Simply put, Grimes knew or should have known that affiliates were rewarded merely for recruiting new investors without regard to any efforts by the Affiliates to sell bids or products or otherwise materially support the Zeekler retail business.

*Grimes & Reese, P.L.L.C. and Kevin Grimes Played an Integral Role*

41. Defendants played an indispensable role in the scheme. Because of the lucrative, seemingly "too good to be true" claims being made by RVG and ZeekRewards, many potential investors were skeptical of whether the scheme was legal and legitimate. So, RVG enlisted the aid of Grimes and other legal counsel to assist in promoting and legitimizing the scheme.

42. Grimes helped in several ways. First, despite his knowledge that ZeekRewards was a fundamentally flawed and unlawful pyramid and/or Ponzi scheme and was selling unregistered securities, Grimes offered to create and did create a so-called "compliance course" specifically designed to encourage investors and potential

11

investors to believe that if they satisfied the course then it would be a lawful enterprise. Thus, Grimes knowingly allowed Zeek to portray a false appearance of legality through his bogus "compliance" course.

43. Grimes profited personally from the compliance courses while allowing ZeekRewards yet another source of investor money. Upon information and belief, Grimes received payments from ZeekRewards not only for his legal counsel, but also for sales of his compliance course to Affiliates. Upon information and belief, Grimes provided the compliance course to ZeekRewards for $5 per affiliate, while allowing ZeekRewards to charge affiliates $30 each for the course, personally profiting from it and allowing RVG yet another means of extracting money from unsuspecting Affiliates.

44. As described above, very early in his representation of RVG, Grimes knew or should have known that ZeekRewards was an unlawful program that might change its terminology and surface appearance but would not change in substance. Upon reviewing a beta version of Grimes' compliance course, Wright-Olivares wrote to Grimes on January 22, 2012:

> Seems we have you telling people to run from us in the RPP (Retail Profit Pool – where we share up to 50% of our daily net with the field). Let's discuss that tomorrow. We can change our terminology but if you are actually warning people off of Zeek in the content – then we can't have that can we? :)

45. Soon thereafter, in a February 2012 email, Grimes wrote to another RVG advisor:

> ZeekRewards is a very new, but rather large and fast growing client[].

12

> I am still in the process of getting my arms around its program, but I have some SERIOUS concerns that it very likely meets the definition of an "investment contract." It may have other issues as well, but I'm still reviewing their documents.

46. In addition to Grimes' February 2012 email expressing concerns over Zeek's legality, one affiliate who had completed Grimes' compliance course wrote to him on June 8, 2012:

> I have completed your compliance course with Zeek and really loved it. I am a great advocate of Zeek and have signed up 31 people whom I feel responsible for. . . . One of my downline is asking questions . . . there is a tremendous amount of income going into Zeek and he is concerned the profit share is coming from the new affiliates – which would make it a ponzi scheme.
>
> Can you direct me as to what is the best way to confirm this is not a ponzi scheme[?]

This email apparently gave Grimes no concern. He forwarded it to Dawn Wright-Olivares, stating: "Do you want me to forward these types of communications to you or anyone else, or would you prefer that I simply discard them? I get several of these each week."

47. Nonetheless, Grimes took advantage of the situation, creating and marketing a compliance training course as window dressing for this illegitimate scheme, allowing the course to be sold to the Affiliates for his own profit.

48. Also, beyond his "compliance courses," Grimes further enhanced the legitimacy of the scheme by allowing his name and reputation as a self-styled legal expert on MLM and direct selling programs to be used in connection with the promotion of the program.

13

49. For example, on January 21, 2012, Dawn Wright-Olivares forwarded to Grimes an email from one of Zeek's Affiliate leaders commenting upon Grimes' reputation: "Actually, most of my more 'refined' marketers commented 'if this guy works with Zeek, we are in great hands and this company could stay around for years.' … praying for that for all of us."

50. Also, Grimes appeared on ZeekRewards "leadership calls" with Dawn Wright-Olivares on three separate occasions, promoting ZeekRewards to Affiliate leaders and furthering the false impression that the scheme was legitimate.

51. And, Grimes knew these Affiliates were relying on his implicit endorsement of the program. In an email to Dawn and Paul, Grimes wrote: "Because of my involvement in your conference calls, as well as the announcements on ZeekRewards News, quite a few of your affiliates and prospective affiliates have been attempting to contact me via email or phone. Most of the inquiries have been about the legality of ZeekRewards' program."

52. In addition, Grimes edited and allowed his name to be used in a ZeekRewards promotional article that states, ". . . we knew we needed to be on top of it and way out in front – so we hired Kevin Grimes of Grimes & Reese . . . ."

53. Grimes also edited and allowed his name to be used in a ZeekRewards promotional article in the Network Marketing Business Journal, which upon information and belief was distributed to tens of thousands of Affiliates and prospective Affiliates. As that article states: "Zeek hired . . . the leading direct sales law firm of Grimes & Reese as compliance attorneys."

14

54. Grimes continued representing RVG and billing it for his services until at least August 16, 2012, the day before ZeekRewards was shut down.

55. From the time that Grimes began his representation through the time the unlawful scheme was exposed and shut down, Grimes was an employee of Grimes & Reese. When he engaged in the wrongful conduct described herein, Grimes was acting within the course and scope of his employment with Grimes & Reese and in furtherance of the firm's business. As a result, Defendant Grimes & Reese is liable for the tortious acts of its employee, Kevin D. Grimes, alleged herein.

### FIRST CLAIM FOR RELIEF
**Legal Malpractice / Negligence / Breach of Fiduciary Duty**

56. The Receiver realleges and incorporates by reference the foregoing paragraphs.

57. As RVG's attorneys, Defendants owed a fiduciary duty to RVG that required Defendants to exercise the degree of care, skill, or diligence that an attorney of ordinary skill and knowledge commonly possesses.

58. Defendants' negligent acts and omissions, including creating and helping to implement the compliance program despite knowledge of the scheme's unlawful nature, generally promoting the scheme, and allowing their names to be used to prop up ZeekRewards as a supposedly legitimate enterprise, breached their duties to RVG.

59. Defendants' negligence and breach of this duty proximately caused an injury to RVG in an amount in excess of $100 million.

15

60. As a result of Defendants' breach, RVG is entitled to recover its damages from the Defendants.

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Breach of Fiduciary Duty

61. The Receiver realleges and incorporates by reference the foregoing paragraphs.

62. Burks and the other RVG Insiders owed fiduciary duties to RVG.

63. These Insiders failed to act in good faith and with due regard to RVG's interests when they knowingly operated an unlawful compensation plan and caused hundreds of millions of dollars of damages to RVG.

64. Defendants had knowledge of the Insiders' breaches of their fiduciary duties to RVG.

65. Defendants, knowing that their conduct alleged herein – including creating and helping to implement the compliance program despite knowledge of the scheme's unlawful nature, generally promoting the scheme, and allowing their names to be used to prop up ZeekRewards as a supposedly legitimate enterprise – served to aid or abet the Insiders' breaches, substantially assisted the Insiders in their breaches of fiduciary duty.

66. Defendants knew or should have known that their aiding, abetting, or participation in these breaches of fiduciary duties would result in significant harm to RVG.

67. These breaches of the fiduciary relationship and Defendants' substantial assistance in the breaches have directly and proximately caused substantial harm to RVG,

including, but not limited to, the financial claims of the victims of the Zeek Ponzi and/or pyramid scheme against RVG.

68. RVG is entitled to recover from the Defendants the amount of damages proximately caused by their conduct in an amount to be proven at trial.

69. The Defendants' substantial assistance to these breaches of fiduciary duties was willful, wanton, and outrageous, and RVG is entitled to an award of punitive damages against the Defendants to deter such conduct in the future.

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**

70. The Receiver realleges and incorporates by reference the foregoing paragraphs.

71. The Defendants each benefited from the receipt of money from the Receivership Entities in the form of alleged compensation and other payments which were the property of the Receivership Entities and for which the Defendants did not adequately compensate RVG or provide value. Indeed, the Defendants' work for RVG caused it additional losses by assisting in recruiting victims to the ZeekRewards scheme.

72. The Defendants have unjustly failed to repay RVG for their profit and the excessive benefits they received.

73. The enrichment was at the expense of the Receivership Entities and ultimately at the expense of RVG's creditors / victims.

74. Equity and good conscience require full restitution of the monies received by the Defendants for distribution to RVG's creditors / victims.

75. Accordingly, the Receiver, on behalf of RVG, is entitled to an award of full restitution from the Defendants in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Constructive Trust

76. The Receiver realleges and incorporates by reference the foregoing paragraphs.

77. As alleged above, the assets of the Receivership Entities have been wrongfully diverted as a result of unjust enrichment, breaches of fiduciary duty and other wrongful conduct for the Defendants' individual interests and enrichment.

78. The Receiver has no adequate remedy at law.

79. Because of the past unjust enrichment, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from the Receivership Entities, as well as any assets received by Defendants in the past or on a going forward basis as a result of those transfers from the Receivership Entities.

80. The Receiver is entitled to and demands title, possession, use and enjoyment of the foregoing property for the benefit of the Receivership Estate.

## PRAYER FOR RELIEF

WHEREFORE, the Receiver respectfully requests that the Court:

1. Enter Judgment against each of the Defendants jointly and severally for the losses suffered by RVG and the Defendants' unjust enrichment in an amount to be determined at trial.

2. Award the Receiver just and reasonable attorney fees, subject to Court approval, which are justified in light of the costs to the Receivership Estate in bringing this action.

3. Award prejudgment and post-judgment interest, costs and such other and further relief as the Receiver is entitled to recover.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.


Dated: June 25, 2014                     Respectfully submitted,


/s/ Irving M. Brenner
Kenneth D. Bell, Esq., Receiver
Irving M. Brenner (NC Bar No. 15483)
Matthew E. Orso (NC Bar No. 42409)
Susan Rodriguez (NC Bar No. 40035)
McGuireWoods LLP
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
(704) 343-2000
(704) 373-8836 (fax)
kbell@mcguirewoods.com
ibrenner@mcguirewoods.com
morso@mcguirewoods.com
srodriguez@mcguirewoods.com